JUDGE DANIELS          10 CIV 5390

PREET BHARARA
United States Attorney for the
Southern District of New York
By: SHARON COHEN LEVIN(SCL-4124)
Assistant United States Attorney
One Saint Andrew's Plaza
New York, New York 10007
Tel. (212) 637-1060



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
UNITED STATES OF AMERICA              :

                Plaintiff,            :

            - v -                     :

Real Property Known as Unit 5B        :
Of The Onyx Chelsea Condominium
Located at 261 West 28th Street   :
New York, New York 10001-5933
                                      :

                Defendant-*in-rem*.   :
                                      :
-----------------------------------x

VERIFIED COMPLAINT

10 Civ.

 

Plaintiff, United States of America, files this Complaint

for forfeiture against the above-captioned defendant property

and respectfully alleges the following in accordance with

Supplemental Rule G(2) of the Supplemental Rules for Certain

Admiralty or Maritime Claims and Asset Forfeiture Actions.

### I.  NATURE OF THE ACTION

1.   This is a civil action *in rem* brought by Plaintiff United

States of America, by and through the undersigned attorneys, to

enforce the provisions of 18 U.S.C. § 981 and 18 U.S.C. §§ 1956-

1957 against the defendant real property, described below.

## II.  BASIS FOR FORFEITURE

2.   The defendant property is subject to forfeiture under the following provisions:

(a)   18 U.S.C. § 981(a)(1)(A), which provides for the forfeiture of "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property."

(b)   18 U.S.C. § 981(a)(1)(B), which provides for the forfeiture of the following:

> [a]ny property, real or personal, within the jurisdiction of the United States, constituting, derived from, or traceable to, any proceeds obtained directly or indirectly from an offense against a foreign nation, or any property used to facilitate such an offense, if the offense . . . (i) involves . . . conduct described in section 1956(c)(7)(B); (ii) would be punishable within the jurisdiction of the foreign nation by . . . imprisonment for a term exceeding 1 year; and (iii) would be punishable under the law of the United States by imprisonment for a term exceeding 1 year, if the act or activity constituting the offense had occurred within the jurisdiction of the United States.

Section 1956(c)(7) defines the term "specified unlawful activity."  Under 1956(c)(7)(B)(iv), specified unlawful activity includes an offense against a foreign nation, including a financial transaction occurring in whole or in part in the

2

United States connected to an offense against a foreign nation
involving the bribery of a public official.

    (c) 18 U.S.C. § 981(a)(1)(C), which provides for the
forfeiture of "[a]ny property, real or personal, which
constitutes or is derived from proceeds traceable to a violation
of . . . any offense constituting a 'specified unlawful
activity' (as defined in section 1956(c)(7) of this title), or a
conspiracy to commit such offense."

3.    The above captioned property is subject to forfeiture
because, as further set forth herein, it was involved in money
laundering and represents the proceeds of a bribery and money
laundering scheme conducted by the former president of Taiwan,
his family members, and close associates.  The defendant
property (1) was involved in, constitutes the proceeds of, or is
derived from proceeds traceable to violations of 18 U.S.C.
§ 1956 (money laundering); (2) was involved in, constitutes the
proceeds of, or is derived from proceeds traceable to violations
of 18 U.S.C. § 1957 (money laundering); or (3) was involved in,
constitutes the proceeds of, or is derived from proceeds
traceable to financial transactions taking place in the United
States that constitute an offense against a foreign nation
involving the bribery of a public official, a specified unlawful

3

activity referred to in 18 U.S.C. § 981 (a)(1)(C) and defined in

18 U.S.C. § 1956(c)(7).  Under 18 U.S.C. §§ 981(a)(1)—(3),

property is forfeitable if it constitutes the proceeds of or is

traceable to the proceeds of specified unlawful activity or

offenses under 18 U.S.C. §§ 1956 or 1957.

### III.  THE DEFENDANT IN REM

4.    The defendant property is legally described as follows:

> The Condominium Unit ("Unit") known as Unit No. 5B in
> the building designated by the street address of 261
> West 28th Street ("Building") in The Onyx Chelsea
> Condominium ("Condominium"), Borough of Manhattan,
> County, City, and State of New York, said Unit being
> designated and described by the above Unit No. in a
> certain declaration dated August 16, 2007, made
> pursuant to Article 9-B of the Real Property Law of
> the State of New York ("Condominium Act") establishing
> a plan for condominium ownership of the Building and
> the Land ("Land") upon which the Building is situate
> (which Land is more particularly described as; All
> that certain lot, piece or parcel of land, situate,
> lying and being in the Borough of Manhattan, City,
> County and State of New York, bounded and described as
> follows: Beginning at the corner formed by the
> intersection of the northerly side of West 28th Street
> with the easterly side of Eighth Avenue; Running
> thence northerly, along the easterly side of Eighth
> Avenue, a distance of 73 feet 5-1/2 inches to a point;
> Thence easterly, at right angles to Eighth Avenue, a
> distance of 103 feet 8-1/4 inches to a point; Thence
> southerly, along a line forming an interior angle of
> 91 degrees 00 minutes 50 seconds with the preceding
> course, a distance of 73 feet 5-3/4 inches to the
> northerly side of West 28th Street; Thence westerly,
> along the northerly side of West 28th Street, a
> distance of 104 feet 11-7/8 inches to the corner
> aforesaid, the point or place of Beginning), which
> declaration was recorded in the Office of the Register

of the City of New York, County of New York
("Register's Office") on October 15, 2007, under CRFN
#2007000521004 ("Declaration"). The Unit is also
designated as Tax Lot 1019 in block 778 of Section 3
of the Borough of Manhattan on the Tax Map of the Real
Property Assessment Department of The City of New York
and on the Floor Plans of the Building, certified by
FXFOWLES Architects, PC and filed with the Real
Property Assessment Department of The City of New York
on October 5, 2007, as Condominium Plan No. 1795 and
also filed in the Register's Office on October 15,
2007, as Condominium Map No. CRFN #2007000521005.

5. The defendant property is owned by a New York limited

liability company, West 28th Street LLC. West 28th Street LLC

is owned by a British Virgin Island company, Avallo Ltd. HUANG,

Jui-Ching, the daughter-in-law of the former president of

Taiwan, CHEN, Shui-Bian, is the beneficial owner and director of

Avallo Ltd. Avallo Ltd. is held in trust by the Knight Square

Irrevocable Trust, an Island of Nevis trust, with a British

Virgin Islands Company, Global Fiduciaries Limited, as trustee.

Stefan Seuss is a director of Global Fiduciaries Ltd., which was

established to serve as a trustee for asset protection and other

types of trusts established by Seuss & Partners, LLC.

6. The defendant property has not been seized but is located

within this district and within the jurisdiction of the Court.

The United States does not request authority from the Court to

seize the real property defendant at this time. The United

States will, as provided by 18 U.S.C. § 985(b)(1) and (c)(1), Supplemental Rule G(4), and Local Admiralty Rules C.2 and C.3:

   a. post notice of this action and a copy of the Complaint on the defendant real property; and

   b. serve notice of this action on the defendant real property owner, and any other person or entity who may claim an interest in the defendant, along with a copy of this Complaint; and

   c. file a *lis pendens* in county records of the defendant real property's status as a defendant in this *in rem* action; and

   d. publish notice of action as required by statute and applicable rules.

The United States will also appraise the defendant real property.

### IV.    JURISDICTION AND VENUE

7.    This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1345 (district courts have original jurisdiction of all civil cases commenced by the United States) and § 1355(a) (district courts have original jurisdiction of any action for forfeiture).

8.    Venue is established by virtue of 28 U.S.C. §§ 1355(b), 1391(b), and 1395.

9.    This civil action, *in rem,* for forfeiture is governed by Title 18, United States Code, Sections 981 and 983, and Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

## V.    FACTS

10.    The former president of Taiwan, CHEN, Shui-Bian; former first lady of Taiwan, WU, Sue-Jen; their son CHEN, Chih-Chung; CHEN, Chih-Chung's wife, HUANG, Jui-Ching; and several collaborators were indicted in December 2009 by the Taiwan Special Prosecutor's Office for crimes involving corruption and money laundering. *See Republic of China (Taiwan) v. CHEN, Shui-Bian, et al.,* Original Bill of Indictment, Special Investigation Division, Supreme Prosecutors Office, No. 0197400006 (Dec. 25, 2009, Taipei D. Ct.). Trial has yet to begin on the charges in the indictment. The indictment includes charges that former president CHEN, Shui-Bian and his wife WU, Sue-Jen laundered millions of dollars of illicit funds that had been held in vaults at Cathay United Bank in Taiwan in violation of Article 9.1 of Taiwan's Money Laundering Control Act.[1] The indictment

---

[1] Taiwan amended its Money Laundering Control Act in 2007.

7

also charged that the son and daughter-in-law of the former first couple, CHEN, Chih-Chung and HUANG, Jui-Ching, had laundered funds on behalf of the first couple in violation of Article 11.2 of Taiwan's Money Laundering Control Act. Prior indictments led to convictions of CHEN, Shui-Bian and WU, Sue-Jen for embezzlement, bribery and money laundering, as well as money laundering convictions for several other members of the former first family and family associates.[2]

11. In 2005 and 2006, Yuanta Securities Co. Ltd. ("YSC"), a firm owned by the MA family, was attempting to increase its ownership share of Fuhwa Financial Holding Company Limited ("FFHC"). Former first lady WU, Sue-Jen told Taiwanese prosecutors that YSC and its two competitors in the acquisition, the opposition political party Koumintang ("KMT") and KOO, John-

CHEN, Shui-Bian and WU, Sue-Jen's indictments related to the money in the vaults at Cathay United Bank were charged under the prior version of the Act that was in effect at the time of their offenses.

[2] On September 11, 2009, CHEN, Shui-Bian and WU, Sue-Jen were convicted of embezzling funds from a special presidential fund and are currently serving 20 year sentences for this and lesser sentences for accepting bribes and money laundering. CHEN, Chih-Chung and HUANG, Jui-Ching were convicted of related money laundering; CHEN, Chih-Chung is currently sentenced to 14 months in prison, while HUANG, Jui-Ching is sentenced to 12 months. The September 2009 convictions were upheld on appeal and are currently being appealed to the Supreme Court of Taiwan. In addition, WU, Sue-Jen had previously pled guilty to other money laundering and forgery charges and has been convicted of perjury for asking her children to lie in court.

Ynn, all invested a large amount of money fighting for control of FFHC. YSC paid a bribe of two hundred million New Taiwan dollars (NTD 200 million, equivalent to approximately $6 million USD) to the then-first lady, WU, Sue-Jen, to ensure that the government would not interfere with its acquisition of additional shares and to attempt to establish a relationship with the head of the Taiwanese government.

12. In sworn statements given to Taiwan Prosecutors, MA, Wei-Chen, the chief executive officer of YSC, stated that he asked YSC director TU, Li-Ping to speak with then-First Lady WU, Sue-Jen about avoiding government interference in YSC's acquisition of FFHC. MA, Wei-Chen stated that it was common knowledge that if government "help" was needed in such transactions, "one must get consent from Madam," meaning the consent of the then-first lady.

13. In a sworn statement to Taiwanese Prosecutors, YSC CEO MA, Wei-Chen further stated that after his colleague TU, Li-Ping met with former first lady WU, Sue-Jen, TU, Li-Ping advised him that "according to the on-going rate," they should send NTD 200 million to the official residence of the President of Taiwan. MA, Wei-Chen stated that several individuals delivered this cash to the official residence in five or six fruit boxes. YSC

director TU, Li-Ping described her meeting with the then-first lady to Taiwanese prosecutors, including a description of the following payment of NTD 200 million in cash and that the money was delivered to the official residence of the President in fruit boxes. TU, Li-Ping characterized this payment as a "political contribution."

14. Former first lady WU, Sue-Jen has admitted to Taiwanese prosecutors that she received several cash "political contributions" given on behalf of numerous Taiwan corporations at the official residence of the President of Taiwan after the 2004 Taiwan Presidential election. According to the former first lady's statements, these cash "political contributions" totaled approximately NTD 540 million (about $17 million USD).

15. Former first lady WU, Sue-Jen further told Taiwanese prosecutors that cash received for the "elections," including the NTD 200 million received from YSC, was initially maintained in a larger vault room at the Cathay United Bank, Taipei, Taiwan, but was moved to a smaller vault room at the same bank after the election because there was less cash. When asked about these "political donations," the former first lady stated,

> All of them [business people] made donations during
> elections. If you were to ask business people, none
> of them would dare to admit it. . . . [I]f any of
> them requested for a receipt, I always made sure they

got it. But some people were afraid of getting into trouble, so they did not want us to issue receipts.

16. The Chairman of the Cathay United Bank LEE, Ming-Hsien, told Taiwanese prosecutors that then-first lady WU, Sue-Jen had contacted him by telephone, stating that she was sending her sister-in-law, WU-CHEN, Chun-Ying, to Cathay United Bank to lease a vault room; the lease was to be in WU-CHEN, Chun-Ying's name. Chairman LEE, Ming-Hsien further stated that former first lady WU, Sue-Jen "required me to keep the vault lease confidential." Chairman LEE, Ming-Hsien has provided Taiwanese prosecutors with copies of the Lease Agreement and the Registration Card between Cathay United Bank and the first lady's sister-in-law WU-CHEN, Chun-Ying, reflecting that on May 3, 2003, WU-CHEN, Chun-Ying leased a large vault room and that on April 26, 2006, she renewed the lease for a smaller vault room.

17. The former first lady's sister-in-law WU-CHEN, Chun-Ying confirmed that she acquired the vault leases in her own name, claiming to Taiwanese prosecutors that she had done so at the request of former first lady WU, Sue-Jen, and that she had given the key and vehicle access card to former first lady WU, Sue-Jen.

11

18.   The Fourth Indictment of CHEN, Shui-Bian, *et al.* in Taiwan alleges that former first lady WU, Sue-Jen and former president CHEN, Shui-Bian held NTD 740 million in cash from illicit sources concealed in a vault at Cathay United Bank.  *Republic of China (Taiwan) v. CHEN, Shui-Bian, et al.*, Original Bill of Indictment, Special Investigation Division, Supreme Prosecutors Office, No. 0197400006 (Dec. 25, 2009, Taipei D. Ct.).  This vault was leased under the name of the first lady's sister-in-law, WU-CHEN, Chun-Ying.

19.   CHEN, Chen-Hui, the Cashier in the Office of the President of Taiwan, has provided a sworn statement to Taiwanese prosecutors saying that, on the instructions of former first lady WU, Sue-Jen, she would be given the vault key and access card and would then deliver the cash "donations" to a vault room at the Cathay United Bank leased in the name of WU-CHEN, Chun-Ying.  Cashier CHEN, Chen-Hui stated that each time she went to the vault, she was required to count the total amount of cash stored there and report it to WU, Sue-Jen.  The largest amount she could recall was in excess of NTD 1.1 billion ($34.38 million USD).

20.   CHEN, Chih-Chung, son of the former President and the former first lady of Taiwan, has told Taiwanese prosecutors that

his mother had advised him that the vault room at the Cathay

United Bank at one time contained approximately NTD 1.1 billion

cash, some of which was from the same sources his mother named

as making cash "political contributions."  CHEN, Chih-Chung

stated that after the 2004 Taiwan Presidential election,

approximately NTD 740 million cash was moved from the vault room

at the Cathay United Bank to the residence of MA, Wei-Chien,

YSC's general manager and the brother of YSC CEO MA, Wei-Chen.

21.  Former first lady WU, Sue-Jen stated to Taiwanese

prosecutors that, after the 2004 Taiwan Presidential election,

she asked YSC director TU, Li-Ping to find another location to

store the cash in the Cathay United Bank vault room because

several persons had learned about the money and its location.

The Fourth Indictment of CHEN, Shui-Bian, et al. in Taiwan

alleges that former first lady WU, Sue-Jen asked YSC director

TU, Li-Ping; WU, Ching-Mao, and others to move the money in the

vault in order to conceal it.

22.  TU-Li-Ping has provided a sworn statement to Taiwanese

prosecutors wherein she stated that she informed the then-first

lady that YSC General Manager MA, Wei-Chien had a very large

storage vault in the basement of his residence; it was decided

to move the cash to MA, Wei-Chien's residence.  Former first

lady WU, Sue-Jen stated that she asked her brother, WU, Ching-Mao; her nephew, WU, Wen-Ching; her sister-in-law, WU-CHEN, Chun-Ying; and YSC director TU-Li-Ping to move the cash to MA, Wei-Chien's basement.

23.   In independent statements, TU, Li-Ping; WU, Ching-Mao; and MA, Wei-Chien have all described to Taiwanese Prosecutors how they participated in moving several suitcases of cash from the vault room at Cathay United Bank to MA, Wei-Chien's basement. MA, Wei-Chien stated that the move involved seven suitcases of cash; TU, Li-Ping and MA, Wei-Chien both stated that the total amount transported was NTD 740 million (approximately $23.1 million US), and WU, Ching-Mao states that the amount was over NTD 700 million.

24.   On February 2, 2010, YSC general manager MA, Wei-Chien and YSC director TU, Li-Ping both pled guilty to money laundering for their roles in moving the cash that was in the vault at Cathay United Bank.

25.   In statements given to Taiwan Prosecutors, YSC general manager MA, Wei-Chien stated that, after he had been storing the former first lady's cash for several months, YSC director TU, Li-Ping relayed instructions to him from former first lady WU, Sue-Jen directing him to place the cash in the banking system

because she feared that the money could be traced to MA, Wei-Chien's basement.  Former first lady WU, Sue-Jen also indicated that she wanted to make overseas investments and asked MA, Wei-Chien to send NTD 540 million overseas for investment while leaving NTD 200 million in an account in Taiwan.  Former first lady WU, Sue-Jen requested that MA, Wei-Chien wire the NTD 540 million directly to his foreign accounts.  MA, Wei-Chien was uncomfortable with commingling the first lady's funds with his own.  MA, Wei-Chien told Taiwanese prosecutors that, as he had existing foreign funds overseas and had concerns about being investigated if he personally wired money back to Taiwan, he decided that, rather than wire the funds out of Taiwan, he would exchange funds in his accounts outside of Taiwan for the cash located in his basement.  To accomplish this exchange, MA, Wei-Chien would transfer funds from his overseas accounts to an account established for the first lady and then deposit the cash that had been stored in his house in to his accounts in Taiwan. To accomplish this exchange, MA, Wei-Chien established Asian Piston Investment Limited, a British Virgin Islands company, for the former first lady, listing himself; his mother; and YSC director TU, Li-Ping as officers and/or directors.  MA, Wei-Chien then opened a bank account in the name of Asian Piston

Investment Limited at the EFG Private Bank, Hong Kong. MA, Wei-Chien initially moved an amount[3] approximately equal to NTD 240 million (approximately $7.54 million USD) from one of his overseas accounts located in Hong Kong, an EFG Bank account in the name of New Atlantic Holdings, to the EFG Bank account of Asian Piston Investment Limited. MA, Wei-Chien then completed the exchange by recouping the funds from his basement and arranging for daily cash deposits of approximately NTD 20 million each into several accounts he owned or controlled in Taiwan.

26. According to MA, Wei-Chien, several months later, before he had been able to transfer a total of NTD 540 million as WU, Sue-Jen directed, YSC director TU, Li-Ping told him that the former first lady wanted $10 million USD immediately deposited into an account at Wegelin & Company Private Bankers in Switzerland in the name of Avallo Ltd. However, the Asian Piston Investment Limited account lacked sufficient funds to make the transfer at that time. Therefore, on or about July 12, 2007, MA, Wei-Chien again effected an exchange and transferred $10 million USD, an amount equivalent at the time to NTD 328 million, directly from

---

[3] In MA, Wei-Chien's statements to Taiwanese prosecutors, he claimed that this initial transfer was of bonds which were later converted to currency.

his New Atlantic Holdings account at EFG Bank in Hong Kong to the Avallo Ltd. account at Wegelin & Company Private Bankers, an account over which the former first lady's son, CHEN, Chih-Chung, has signature authority. In August of 2007, MA, Wei-Chien again received instructions from former first lady WU, Sue-Jen through YSC director TU, Li-Ping, this time asking him to transfer the balance of the account of Asian Piston Investment Limited to Avallo Ltd. By early September 2007, MA, Wei-Chien had transferred approximately $7.57 million USD from the Asian Piston Investment Limited account at EFG Bank to the Avallo Ltd. account at Wegelin & Company Private Bankers. Thus, the funds that had been stored by and transmitted into accounts located outside of Taiwan by YSE general manager MA, Wei-Chien were moved through New Atlantic Holdings and Asian Piston Investment Limited between July and September of 2007. These funds were then transferred to a Swiss account under the sole control of the former president and first lady's son, CHEN, Chih-Chung held in the name of Avallo Ltd.

27. Avallo Ltd. is a British Virgin Islands (BVI) shell company. It was incorporated on May 8, 2007, and has BVI company number 1403059. According to Avallo's official corporate records, HUANG, Jui-Ching, CHEN, Chih-Chung's wife and

the daughter-in-law of the former president and first lady, is the sole director and the declared beneficial owner of Avallo Ltd. However, CHEN, Chih-Chung has sole signatory authority over the Avallo, Ltd. bank account, which is held at Wegelin & Co. Private Bankers in Switzerland.

28. Bravo International Holdings Ltd. is an Island of Nevis business company. Bravo International Holdings has a bank account at Wegelin & Company Private Bankers. CHEN, Chih-Chung is the beneficial owner of Bravo International Holdings and has sole signature authority over the Bravo account.

29. Bank records indicate that on or about December 19, 2007, a transfer of $17,500,000.00 USD was made from the Avallo Ltd. account at Wegelin & Company Private Bankers to the Bravo International Holdings account. During May and June of 2008, two transfers totaling $2,075,009.71 were made from the Bravo International Holdings Ltd. account to the trust account of the Law Offices of Mitchell S. Polansky, Esq. In May of 2008, a transfer of $160,000 was made to the attorney trust account of Starr Associates LLP, a firm specializing in the initial offerings of condominiums and other real estate. CHEN, Chih-Chung, son of the former president and first lady of Taiwan, had sole signature authority over the Bravo and Avallo accounts

referred to in paragraphs 27 and 28 at the time of this activity.

30. CHEN, Chih-Chung confessed to Taiwanese prosecutors that after NTD 740 million (approximately $23 million USD) in cash was moved from the Cathay United bank vault to the basement of the residence of YSC general manager MA, Wei-Chien, an amount equivalent to approximately $17,000,000.00 USD was deposited into two Wegelin & Company Private Bankers accounts; one in the name of Avallo Ltd., and the other in the name of Bravo International Holdings Ltd. CHEN, Chih Chung further stated that a portion of the $17,000,000.00 was used to purchase real estate in Virginia and New York.

31. When he required assistance in acquiring real estate in May, 2007, CHEN, Chih-Chung was introduced to Stefan Walter Rasso Seuss, a director of Seuss & Partners, LLC in Miami, Florida. Seuss stated that he was advised that the funds held in accounts at the Wegelin & Company Private Bankers in the names of Bravo International Holdings Ltd. and Avallo Ltd. were from funds belonging to former first lady WU, Sue-Jen. Seuss has further stated that in the spring of 2008, CHEN, Chih-Chung and his wife, HUANG, Jui-Ching, told him that they wanted to purchase real estate in New York and Virginia while concealing

their ownership in the properties. Seuss stated that for the purpose of purchasing and managing the defendant property, he created West 28th Street LLC under the ownership of Avallo Ltd., which was held in trust for the benefit of HUANG, Jui-Ching. Seuss stated that after selecting the properties to be purchased, CHEN, Chih-Chung transferred funds from the Bravo International Holdings Ltd. account at Wegelin & Company Private Bankers to the Trust Account of Mitchell Polansky, an estate attorney working at Seuss & Partners, LLC. The defendant property, which was offered for sale by Starr Associates, was ultimately purchased for $1,575,000.00 in the name of West 28th Street LLC with these funds on May 29, 2008.

VI. REQUEST FOR RELIEF

32. As outlined in paragraphs 10-31, the funds used to purchase the defendant real property can be traced back through the Bravo International Holdings Ltd. and Avallo Ltd. accounts through the Asian Piston and New Atlantic Holdings accounts managed by YSC general manager MA, Wei-Chien to the cash paid as a bribe by YSC CEO MA, Wei-Chen to former first lady WU, Sue-Jen.

33. Therefore, the defendant property should be forfeited to the United States because a preponderance of the evidence shows the following:

First Claim

34.  The Plaintiff repeats the allegations of paragraphs 1 through 33 as if fully set forth herein.

35.  The defendant property is subject to forfeiture under 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in or traceable to a violation of 18 U.S.C. § 1956(a)(1)(B). Section 1956(a)(1)(B) prohibits attempting or engaging in a financial transaction with the knowledge that the property involved represents the proceeds of specified unlawful activity when the transaction involves property that was in fact proceeds of specified unlawful activity as defined in § 1956(c)(7) and the transaction is designed to conceal or disguise the nature, source, ownership, or control of the proceeds of specified unlawful behavior or to avoid a transaction reporting requirement.  Section 1956(c)(7)(B)(iv) defines specified unlawful activity to include financial transactions occurring wholly or in part in the United States which are an offense against a foreign nation involving the bribery of a public official.  The defendant property was purchased with funds traceable to the proceeds of a specified unlawful activity, the payment of bribes to a foreign official, as defined in § 1956(c)(7).  The defendant property is therefore traceable to

21

the proceeds of specified unlawful activity and CHEN, Chih-
Chung; WU, Sue-Jen; MA, Wei-Chien, and others took steps to
conceal the ownership and source of the funds used to purchase
the property.  The defendant property is therefore both
traceable to and was directly involved in a transaction in
violation of § 1956 and is thus forfeitable pursuant to 18
U.S.C. § 981(a)(1)(A).

### Second Claim

36.  The Plaintiff repeats the allegations of paragraphs 1
through 35 as if fully set forth herein.

37.  The defendant property is subject to forfeiture under 18
U.S.C. § 981(a)(1)(A) because it constitutes property involved
in or traceable to a transaction or an attempted transaction in
violation of 18 U.S.C. § 1956(a)(2)(B).  The defendant property
is traceable to a transaction in violation of 18 U.S.C.
§ 1956(a)(2)(B) because, as described above, the funds used to
purchase the defendant property were transmitted to a place in
the United States, from or through a place outside the United
States, with the knowledge that the funds were traceable to the
proceeds of specified unlawful activity, namely, the bribery of
a public official, and the transfer was designed in whole or in
part to conceal or disguise the nature, location, the source,

the ownership, or the control of illicit funds.    The defendant

property is forfeitable because a violation of any subsection of

18 U.S.C. § 1956 subjects all property involved in or traceable

to such property to forfeiture under 18 U.S.C. § 981(a)(1)(A).

<u>Third Claim</u>

38.    The Plaintiff repeats the allegations of paragraphs 1

through 37 as if fully set forth herein.

39.    The defendant property is subject to forfeiture under 18

U.S.C. § 981(a)(1)(A) because it constitutes property involved

in or traceable to a transaction or at attempted transaction in

violation of 18 U.S.C. § 1957(a).    The defendant property is the

proceeds of violations of 18 U.S.C. § 1957(a) because the funds

used to purchase the property were transmitted in amounts

greater than $10,000; those funds were known to be and were

derived from specified unlawful activity, namely, offenses

against a foreign nation involving bribery or misappropriation

of public funds; and the funds were transferred in interstate

and foreign commerce through a financial institution.    A

violation of any subsection of 18 U.S.C. § 1957 subjects all

property involved in the transaction to forfeiture under 18

U.S.C. § 981(a)(1)(A).    As such, the defendant property is

forfeitable pursuant to 18 U.S.C. § 981(a)(1)(A).

Fourth Claim

40.  The Plaintiff repeats the allegations of paragraphs 1 through 39 as if fully set forth herein.

41.  The defendant property is subject to forfeiture under 18 U.S.C. § 981(a)(1)(B) because it is traceable to proceeds obtained from an offense against a foreign nation where the conduct constituting the offense is described in § 1956(c)(7)(B) and the offense would be punishable by imprisonment by more than one year in both Taiwan and the United States had the offense occurred in the United States.  Bribery of a foreign official is an offense against a foreign nation described in § 1956(c)(7)(B)(iv).  Violations of the various articles of Taiwan's Anticorruption Statute can and have been punished by imprisonment for a minimum of one to ten years, depending on the Article violated; the same conduct would be punishable by imprisonment for more than one year if committed in the United States.  In addition, violations of Taiwan's Money Laundering Control Act are punishable by imprisonment of not more than 5 years; in the United States, similar conduct is punishable by imprisonment of not more than 10 or 20 years depending on the particular statute violated.  Therefore, the defendant property is forfeitable under 18 U.S.C. § 981(a)(1)(B) because it is

traceable to the proceeds of an offense against a foreign nation
that would involve imprisonment of more than one year in both
the United States and Taiwan.

### Fifth Claim

42.  The Plaintiff repeats the allegations of paragraphs 1
through 41 as if fully set forth herein.

43.  The defendant property is subject to forfeiture under 18
U.S.C. § 981(a)(1)(C) because it is traceable to the proceeds of
specified unlawful activities as defined in 18 U.S.C.
§ 1956(c)(7).  As described above, the defendant property was
purchased with funds which were the proceeds of financial
transactions involving an offense against a foreign nation,
specifically bribery of a public official.  18 U.S.C.
§ 1956(c)(7)(B)(iv).  The defendant property is therefore
forfeitable because any property that constitutes or is derived
from proceeds traceable to any offense defined as specified
unlawful activity under § 1956(c)(7) is forfeitable under 18
U.S.C. § 981(a)(1)(C).

<u>Sixth Claim</u>

44.  The Plaintiff repeats allegations of paragraphs 1 through 43 as if fully set forth herein.

45.  The defendant property is subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from the proceeds of a conspiracy to commit specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7).  Under 18 U.S.C. § 1956(h), any party who conspires to violate a provision of §§ 1956 or 1957 is subject to the same penalties as a one who commits the complete offense.  As described above, there was a conspiracy amongst CHEN, Shui-Bian; WU, Sue-Jen; CHEN, Chih-Chung; HUANG, Jui-Ching; and others to engage in transactions that violated 18 U.S.C. §§ 1956 and 1957.  In particular, there was a conspiracy to purchase the defendant real property with the proceeds of specified unlawful activity valued at more than $10,000 in violation of 18 U.S.C. § 1957 and, to facilitate that purchase, to transfer money known to be the proceeds of unlawful activity into the United States from abroad where the transfer was designed to conceal the nature, location, source, ownership, or control of the proceeds of specified unlawful activity. Therefore, the defendant property is forfeitable to the United States.

WHEREFORE, Plaintiff requests as follows:

(1)  That due notice be given to any and all persons having any claim to the defendant real property to file and serve their Verified Claims and Answer as required by 18 U.S.C. § 983(a)(4) and Supplemental Rule G or suffer default thereof;

(3)  That a Judgment of Forfeiture be entered declaring the defendant real property forfeited to the United States of America for disposition according to law and that, pursuant to 18 U.S.C. § 981(f), all right, title, and interest in the defendant real property vested in the United States upon the commission of the first act giving rise to forfeiture; and

/

/

/

/

/

/

/

/

/

27

(4)  That the United States of America be granted such other

relief as this Court may deem just and proper, together with the

costs and disbursements of this action.

Dated:  New York, New York
        July  14  , 2010

                              PREET BHARARA
                              United States Attorney for the
                              Southern District of New York

                         By: _____

                              SHARON COHEN LEVIN (SCL-4124)
                              Assistant United States Attorney
                              One St. Andrew's Plaza
                              New York, New York 10007
                              Telephone: (212) 637-1060

                              JAMES MEADE
                              Acting Chief
                              Asset Forfeiture and Money
                              Laundering Section
                              Criminal Division
                              United States Department of
                              Justice

                         By: _____

                              LINDA M. SAMUEL (DC Bar #388970)
                              Deputy Chief
                              ROBERT STAPLETON (NY Bar #407568)
                              Trial Attorney
                              1400 New York Avenue, N.W., 10th
                              Floor
                              Washington, D.C. 20530
                              Telephone:  (202) 514-1263


                              Attorneys for the Plaintiff
                              United States of America

                                   28

VERIFICATION

City of Miami          )
State of Florida       )

I, Donald Bromberg, being duly sworn, deposed and say that I am

an Agent with U.S. Immigration and Customs Enforcement in Miami,

Florida.  I have read the foregoing Verified Complaint for

Forfeiture and declare under penalty of perjury of the laws of

the United States of America that it is true and correct to the

best of my knowledge, information and belief, the source of my

knowledge, information and belief being my personal involvement

in the investigation, my review of the reports furnished to me

from other law enforcement officers familiar with the case, and

my conversations with other law enforcement officers familiar

with the case.

Donald Bromberg, Special Agent
U.S. Immigrations and Customs Enforcement

Subscribed and sworn to before me this 12ᵗʰ day of July, 2010.

Notary Public

My Commission Expires:

VICTORIA M. THOMPSON
MY COMMISSION # DD966916
EXPIRES March 02, 2014
(407) 398-0153    FloridaNotaryService.com