UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ____________
DATE FILED: 8/26/11

UNITED STATES OF AMERICA, :

Plaintiff, :

-against- :

REAL PROPERTY KNOWN AS UNIT 5B OF THE ONYX CHELSEA CONDOMINIUM LOCATED AT 261 WEST 28TH STREET, NEW YORK, NEW YORK 10001-5933, :

Defendant-in-rem. :

--------------------------------------------------------x

**REPORT AND RECOMMENDATION TO THE HONORABLE GEORGE B. DANIELS**

10 Civ. 5390 (GBD) (FM)

**FRANK MAAS,** United States Magistrate Judge.

The Government brings this in rem action, pursuant to 18 U.S.C. § 981, seeking the forfeiture of a condominium unit in the Onyx Chelsea building located at 261 West 28th Street in Manhattan ("Apartment"). The Apartment is owned by West 28th Street LLC, a New York limited liability company, which, in turn, is owned by the claimant in this action, Avallo Ltd. ("Avallo"). The Government alleges that the Apartment is subject to forfeiture because it was purchased (a) with money paid as a bribe to the former first lady of Taiwan, Wu Sue-Jen ("First Lady"), to influence decision-making concerning the merger of two Taiwanese financial firms, and (b) for the purpose of laundering the bribe money.

The Complaint sets forth six bases for forfeiture. In the first three claims for relief, the Government contends that forfeiture is warranted under 18 U.S.C.

§ 981(a)(1)(A) ("Section 981(a)(1)(A)") because the Apartment was "involved in" or is "traceable to" three forms of money laundering: (i) transaction money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), (ii) transportation money laundering, in violation of 18 U.S.C. § 1956(a)(2)(B)(i), and (iii) engaging in a monetary transaction involving "criminally derived property of a value greater than $10,000," in violation of 18 U.S.C. § 1957(a). In the fourth claim for relief, which arises under 18 U.S.C. § 981(a)(1)(B) ("Section 981(a)(1)(B)"), the Government alleges that the Apartment is "traceable to proceeds obtained from an offense against a foreign nation," namely, the "bribery of a public official," and that this offense (like its United States equivalent) is punishable by imprisonment for more than one year. Finally, in the fifth and sixth claims for relief, the Government maintains that forfeiture is available under 18 U.S.C. § 981(a)(1)(C) ("Section 981(a)(1)(C)") because the Apartment constitutes, or is derived from, proceeds traceable to (i) a "specified unlawful activity" defined in 18 U.S.C. § 1956(c)(7)(B)(iv) ("Section 1956(c)(7)(B)(iv)"), namely, "bribery of a [foreign] public official," and (ii) a conspiracy to commit money laundering. (See ECF No. 1 ("Complaint" or "Compl.") ¶¶ 35-45).

Avallo has moved to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (ECF No. 22). Avallo contends that the Complaint must be dismissed because (a) neither the First Lady nor her husband, Chen Shui-bian, the former president of Taiwan ("President"), accepted a bribe relating to the proposed merger, in violation of either United States or Taiwanese law; (b) the conduct constituting

the alleged bribery occurred entirely outside the United States and, therefore, does not fall within the specified unlawful activity described in Section 1956(c)(7)(B)(iv); (c) the Complaint fails to allege that the Apartment was purchased in order to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the alleged bribery; and (d) Section 1956(c)(7)(B)(iv) is unconstitutionally vague.

For the reasons set forth below, Avallo's motion to dismiss should be granted.

## I. Background

### A. Facts

The following facts taken from the complaint are presumed to be true.

In 2005, Yuanta Securities Co. Ltd. ("Yuanta"), a Taiwanese financial firm, began a multi-year effort to take control of Fuhwa Financial Holding Company Limited ("Fuhwa"), another Taiwanese company. (See Compl. ¶ 11). To ensure that the Taiwanese government did not interfere with the merger, and to attempt to establish a relationship with Taiwan's first family, Ma Wei-Chen ("Ma"), Yuanta's chief executive officer, asked one of Yuanta's directors, Tu Li-Ping ("Tu"), to contact the First Lady, as it was "common knowledge that if government help was needed in such transactions, one must get [the First Lady's] consent." (Id. ¶¶ 11-12). After meeting with the First Lady, Tu advised Ma that they should send 200 million New Taiwan Dollars ("NTD"), or approximately USD $6 million, to the President's official residence. (Id. ¶¶ 11, 13).

Several individuals subsequently delivered the cash to the official residence in five or six fruit boxes. (Id. ¶ 13).

This cash initially was stored in a vault at the Cathay United Bank ("Cathay") in Taipei along with other "political contributions" received by the President and First Lady. (Id. ¶¶ 14-15). Although the vault was leased in her sister's name, the First Lady had a key and access card, which she used when she personally delivered cash to the vault. (Id. ¶¶ 16-17, 19). At one point, the vault contained in excess of NTD 1.1 billion, or USD $34.38 million. (Id. ¶¶ 19-20).

Sometime after the 2004 Taiwanese presidential election, the First Lady asked Tu to find another place to store the cash "because several persons had learned about the money and its location." (Id. ¶ 21). Tu informed the First Lady that Ma had a large storage vault in the basement of his home. (Id. ¶ 22). Accordingly, the cash, which by then totaled NTD 740 million (USD $23.1 million), was moved into Ma's vault.[1] (Id. ¶¶ 22-23).

Several months later, the First Lady directed Tu and Ma to "place the cash in the banking system because she feared that the money could be traced to Ma['s] . . . basement." Specifically, she instructed Ma to wire NTD 540 million directly to his personal offshore accounts and to deposit the remaining NTD 200 million into an account in Taiwan. Rather than commingling the NTD 540 million with his own money,

---

[1] On February 2, 2010, Ma and Tu pleaded guilty to money laundering charges in Taiwan for their roles in moving the cash from Cathay to Ma's vault. (Id. ¶ 24).

however, Ma decided to "exchange funds in his accounts outside of Taiwan for the cash located in his basement." Ma therefore transferred money from his own foreign accounts to an account that he created for the First Lady at a Hong Kong bank in the name of Asian Piston Investment Limited ("Asian Piston"), a British Virgin Islands company. Ma then deposited the cash from his basement into several accounts under his control in Taiwan in multiple installments. (Id. ¶ 25).

Before Ma completed the process of transferring the cash out of the vault in his basement, the First Lady, communicating through Tu, asked Ma to transfer USD $10 million immediately to an account in Avallo's name at Wegelin & Company ("Wegelin"), a private banking firm in Switzerland. Because the Asian Piston account lacked the funds necessary to make this transfer, Ma utilized money from one of his personal accounts in Hong Kong. (Id. ¶¶ 26-27).

In August 2007, the First Lady, once again communicating through Tu, instructed Ma to transfer the balance of the funds in the Asian Piston account into the Avallo account. Accordingly, by early September 2007, approximately USD $7.57 million was transferred from the Asian Piston account to the Avallo account. (Id. ¶ 27). Three months later, on December 19, 2007, the USD $17.5 million in the Avallo account was transferred to another account at Wegelin in the name of Bravo International Holdings ("Bravo"), a company organized under the laws of the Island of Nevis. (Id. ¶¶ 28-29). The First Lady's son, Chen Chih-Chung ("Chen"), had sole signature

authority over both the Avallo and Bravo accounts, and his wife is the sole director and beneficial owner of Avallo. (Id. ¶¶ 27-28).

In the spring of 2008, Chen and his wife contacted Stefan Seuss ("Seuss"), a director of a wealth management firm in Miami, Florida, to inquire about purchasing real estate in New York and Virginia. (Id. ¶ 31). After they indicated that they wanted to "conceal[] their ownership in the properties," Seuss created West 28th Street LLC for the purpose of acquiring the Apartment. (Id.). In May and June 2008, two transfers totaling slightly over USD $2 million were made from the Bravo account to the trust account of Mitchell S. Polansky, Esq. ("Polansky"), an estate attorney at Seuss' firm. (Id. ¶ 29). On May 29, 2008, West 28th Street LLC purchased the Apartment for USD $1.575 million using these funds. (Id. ¶ 31). Chen allegedly has confessed to Taiwanese authorities that cash formerly held in the Cathay vault was used to buy the Apartment, and that the cash constituted the proceeds of "political contributions." (Id. ¶¶ 20, 30).

In December 2009, the Taiwanese Special Prosecutor's Office indicted the President, the First Lady, and others for "crimes involving corruption and money laundering" arising out of the Yuanta-Fuhwa merger.[2] (See id. ¶ 10). Specifically, the President and First Lady were charged with violating various sections of Taiwan's Anti-Corruption Statute, which, in general, prohibits "public officials" and their accomplices from soliciting or accepting bribes in exchange for the performance or non-performance

---

[2] On September 11, 2009, the President and First Lady were convicted, under previous indictments, of embezzling funds from a special presidential fund, accepting bribes, and money laundering, for which they were sentenced to twenty-year prison terms. (Id. ¶ 10 & n.2).

of official acts or duties. (See ECF No. 24 ("Clmnt.'s Mem.") Ex. 3 ("Taiwan Decision") at 1-20); Anti-Corruption Statute, Articles 3-6, http://db.lawbank.com.tw/Eng/FLAW/FLAWDAT0202.asp (last visited Aug. 26, 2011)).

On November 5, 2010, a Taiwanese trial court acquitted the First Lady and the President of the bribery charges, concluding that (a) the First Lady was not a "public servant;" (b) Yuanta's payments were not made "to entice [her] to make arrangements for relevant public servants [i.e., the President] to perform public duties to the benefit of Ma[];" and (c) there was no evidence that the President knew that the First Lady had accepted any money from Yuanta. (See Taiwan Decision at 1-2, 8, 19-20; Clmnt.'s Mem. Ex. 4). The Taiwanese Special Prosecutor's Office subsequently appealed the decision. (See Clmnt.'s Mem. Ex. 4). A decision from the appellate court is still pending.

B. Procedural History

The Government initiated this action on July 14, 2010.[3] (ECF No. 1). After Avallo filed its motion to dismiss on January 24, 2011, the Government filed opposition papers on February 22, 2011, and Avallo filed a reply memorandum on March 8, 2011.

---

[3] The same day, the Government also commenced an in rem action in the Western District of Virginia, seeking the forfeiture of a Virginia property purchased by Polansky on the same grounds asserted here. See United States v. Real Property known as 2291 Ferndown Lane, Keswick VA 22947-9195, No. 10 Civ. 37, 2011 WL 2441254 (W.D. Va. June 14, 2011). On June 14, 2011, Judge Norman K. Moon partially granted Avallo's motion to dismiss. Id. at *1. Specifically, Judge Moon dismissed the Government's forfeiture claim under Section 981(a)(1)(A) insofar as the Government alleged that the property was traceable to transaction money laundering. Id. at *6. Judge Moon also dismissed the Government's forfeiture claim under Section 981(a)(1)(B). Id. at *4-5. Judge Moon declined to dismiss the Government's remaining four claims for relief. Id. at *5-8.

(ECF Nos. 22, 27, 30). On March 22, 2011, Your Honor referred the fully-submitted motion to me for a Report and Recommendation. (ECF No. 32).

II. Standard of Review

"Motions to dismiss in rem forfeiture actions are governed by Federal Rule of Civil Procedure 12(b) and Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions [("Supplemental Rules")])." In re 650 Fifth Ave. & Related Props., No. 08 Civ. 10934 (RJH), 2011 WL 1135058, at *8 (S.D.N.Y. Mar. 29, 2011). Rule 12(b) applies, however, only to the extent that it is consistent with Rule G. See Supp. R. A(2).

Under Rule G(2)(f) of the Supplemental Rules, a complaint must "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial."[4] Supp. R. G(2)(f). Although the "plausibility" standard that a plaintiff must meet to survive a motion to dismiss pursuant to Rule 12(b)(6) is largely consistent with Rule G's "reasonable belief" standard, see United States v. $22,173.00 in U.S. Currency, No. 09 Civ. 7386 (SAS), 2010 WL 1328953, at *2 & n.25 (S.D.N.Y. Apr. 5, 2010) (citing Ashcroft v. Iqbal, 556 U.S. __, 129 S. Ct. 1937, 1949 (2009) and Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)), the Rule G standard controls in forfeiture cases. See id. at *1-2.

---

[4] At trial, the Government bears the burden of proving, by a preponderance of the evidence, that the property is subject to forfeiture. 18 U.S.C. § 983(c)(1).

When evaluating a motion to dismiss an in rem forfeiture complaint pursuant to Rule 12(b)(6), the Court still must accept as true all factual allegations made in the complaint and draw all reasonable inferences in favor of the plaintiff. See United States v. 829,422.42 in U.S. Currency Seized from Account No. 202252771 at Citibank, N.A., No. 08 Civ. 914, 2009 WL 1743753, at *5 (D. Conn. June 18, 2009). Additionally, in making its assessment, the Court may consider not only the plaintiff's factual averments, but also any written instrument upon which the plaintiff necessarily relies, regardless of whether it is attached to the complaint or incorporated therein by reference. See id. The Court also may take judicial notice of indisputable facts. See id.

III. Discussion

Avallo's principal argument in support of its motion to dismiss is that the money used to purchase the Apartment was neither derived from, nor traceable to, any unlawful conduct. (See Clmnt.'s Mem. at 7-14). In Avallo's view, the "Complaint hinges on the allegation that the funds received by [the] former [F]irst [L]ady [] from Yuanta were illegal bribes, and that the act of bribery was the [']specified unlawful activity' that justifies forfeiture of the Apartment. Without this underlying specified unlawful activity, the [G]overnment simply has no case." (Id. at 7).

Avallo's contention is correct. At the outset, to secure the forfeiture of property under Section 981(a)(1)(B), the Government must demonstrate that the property is traceable to the proceeds of "an offense against a foreign nation," 18 U.S.C.

§ 981(a)(1)(B), which, in this case, is the alleged "bribery of a public official." (Compl. ¶ 40 (citing Section 1956(c)(7)(B)(iv))).

Additionally, property is subject to forfeiture under Section 981(a)(1)(A) only if it was "involved in a transaction or attempted transaction in violation of [18 U.S.C. §§] 1956, 1957, or 1960." 18 U.S.C. § 981(a)(1)(A). Sections 1956 and 1957, in turn, require the Government to prove that the defendant conducted or engaged in a financial transaction involving the proceeds of a specified unlawful activity, or transported, transmitted, or transferred the proceeds of such an unlawful activity into or out of the United States. See id. §§ 1956(a)(1)(B), 1956(a)(2)(B), 1957. Section 981(a)(1)(C) similarly provides for the forfeiture of property that "constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' . . . or conspiracy to commit such offense." Id. § 981(a)(1)(C). It follows that property may be forfeited under Sections 981(a)(1)(A) and (C) only if the Government connects the property to a "specified unlawful activity."

In that regard, the Complaint adequately alleges only one specified unlawful activity: "an offense against a foreign nation involving the bribery of a public official." (Compl. ¶¶ 35, 37, 39, 43, 45). While the Government alleges in its third claim for relief that the Apartment is subject to forfeiture "because the funds used to purchase the property were . . . derived from . . . offenses against a foreign nation involving . . . misappropriation of public funds," (id. ¶ 39), as Avallo correctly observes, the Government "has failed to provide any allegations to support that assertion." (Clmnt.'s

Mem. at 7 n.5). Furthermore, although the Government contends in its sixth claim for relief that the Apartment is subject to forfeiture under Section 981(a)(1)(C) because it is traceable to a conspiracy to commit money laundering, (Compl. ¶ 45), money laundering is not a "specified unlawful activity." See 18 U.S.C. § 1956(c)(7).

Accordingly, the dispositive question the Court must determine is whether the Government has pleaded facts sufficient to support a "reasonable belief" that it will be able to prove at trial that Yuanta's payments to the First Lady amount to "bribery of a public official."

A. Choice of Law

In order to make this determination, the Court first must decide whether to apply United States or Taiwanese law. (See Clmnt.'s Mem. at 19 (Section 1956(c)(7)(B)(iv) "does not state whether [bribery of a public official] is to be measured according to United States law or the law of another nation")). Addressing this issue in Ferndown, Judge Moon observed that "there is no ambiguity in the law" because the "specified unlawful activity" requirement under each claim requires "an offense against a foreign nation." 2011 WL 2441254, at *4 (internal quotation marks omitted). "Therefore, the federal bribery statute has no bearing on the determination of 'specified unlawful activity.'" Id. Other courts have arrived at the same conclusion. See United States v. Lazarenko, No. CR 00-284, 2003 U.S. Dist. LEXIS 25940, at *11 (N.D. Cal. Sept. 10, 2003) (in money laundering prosecution, "when the predicate offense involves a foreign nation, as here, the defendant must know that the proceeds were from an activity

(such as extortion) prohibited under foreign law"); United States v. One 1997 E35 Ford Van, 50 F. Supp. 2d 789, 802 (N.D. Ill. 1999) ("Given its ordinary meaning, the phrase 'against a foreign nation' merely requires that the conduct be prohibited under the law of the foreign nation in which it is committed.").

Additionally, the legislative history of Section 1956(c)(7)(B)(iv) makes clear that "an offense against a foreign nation involving . . . bribery of a public official" refers to a crime committed in violation of foreign law. Congress added Section 1956(c)(7)(B)(iv) to the list of specified unlawful activities enumerated in the money laundering statute through its passage of the 2001 Patriot Act. See United States v. All Assets Held at Bank Julius Baer & Co., 571 F. Supp. 2d 1, 10 (D.D.C. 2008). The Patriot Act's Conference Committee report notes that the act "enlarge[d] the list of foreign crimes that can lead to money laundering prosecutions in this country when the proceeds of additional foreign crimes are laundered in the United States." H.R. Rep. No. 107-250 (2001) (emphasis added). The Conference Committee report further states that the Patriot Act "amend[ed] [Section] 981(a)(1)(B) to allow the United States to institute its own action against the proceeds of foreign criminal offenses when such proceeds are found in the United States." Id. (emphasis added). It therefore is clear that Taiwanese law governs whether Yuanta's payments to the First Lady constitute "bribery of a public official."

B. Comity

As noted previously, on November 5, 2010, the First Lady and the President were acquitted of bribery charges arising out of the Yuanta-Fuhwa merger. (See supra at

7). In light of this decision, Avallo asks the Court to defer, as a matter of comity, to the Taipei District Court's determination that Yuanta's payments to the First Lady do not amount to "bribery of a public official" under Taiwanese law. (Clmnt.'s Mem. at 10 ("If the duly constituted bodies of the foreign nation have determined that there was no offense, there is certainly no statutory basis for the [G]overnment to assert a claim that such an offense was committed.")).

"'It is well-established that United States courts are not obliged to recognize judgments rendered by a foreign state, but may choose to give res judicata effect to foreign judgments on the basis of comity.'" Diorinou v. Mezitis, 237 F.3d 133, 139-40 (2d Cir. 2001) (quoting Gordon & Breach Sci. Publ'rs S.A. v. Am. Inst. of Physics, 905 F. Supp. 169, 178 (S.D.N.Y. 1995)) (emphasis in Gordon). This principle applies no less to foreign criminal judgments than to their civil counterparts. See Hartford Fire Ins. Co. v. The Socialist People's Libyan Arab Jamahiriya, No. 98 Civ. 3096, 2007 WL 1876392, at *9-12 (D.D.C. June 28, 2007) (relying on conviction obtained in Scottish criminal court to conclude that Libya was civilly liable for the bombing of Pan Am Flight 103); Hurst v. Socialist People's Libyan Arab Jamahiriya, 474 F. Supp. 2d 19, 34-36 (D.D.C. 2007) (same); Hunt v. BP Exploration Co. (Libya), Ltd., 492 F. Supp. 885, 900 (N.D. Tex. 1980) (quoting R. von Mehren & Patterson, Recognition and Enforcement of Foreign-Country Judgments in the United States, 6 L. & Pol'y in Int'l Bus. 37, 44 (1974)) ("although a U.S. court certainly will not impose a foreign country's penalties for violation of that country's laws, the court will recognize penal judgements [sic] by

deeming them conclusive with respect to the violation of foreign law if the issue is raised in a proceeding in the United States").

A United States court must be guided by "principles of fairness and reasonableness" in deciding whether to defer to the judgment of a foreign court as a matter of comity. Gordon, 905 F. Supp. at 179. Indeed, "[c]omity should only be extended if the foreign court abided by fundamental standards of procedural fairness." Maersk, Inc. v. Neewra, Inc., No. 05 Civ. 4356 (CM), 2010 WL 2836134, at *10-11 (S.D.N.Y. July 9, 2010) (brackets and internal quotation marks omitted). As the Supreme Court stated in Hilton v. Guyot, "the merits of the case should not, in an action brought in this country upon the [foreign] judgment, be tried afresh," where

> there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect.

159 U.S. 113, 202-03 (1895).

Here, there is no evidence from which the Court could conclude that the judicial system pursuant to which the President and First Lady were tried on bribery charges in the Taipei District Court was fundamentally unfair. Certainly, the President and the First Lady would not so contend since they were acquitted. Nor could the

Government advance such an argument because, on September 11, 2009, the President and First Lady were convicted of a number of crimes charged in prior indictments, including embezzlement, receiving bribes, and money laundering, for which they currently are serving twenty-year prison sentences. (Compl. ¶ 10 & n.2). In light of these divergent outcomes, it cannot be said that the proceedings before the Taipei District Court were so consistently unfavorable to the Government as to raise the specter of unfairness.

The Government nevertheless maintains that the Taipei District Court's decision should not lead to the dismissal of its forfeiture claims because: (1) the translation of a summary of the Taipei District Court's decision annexed to Avallo's moving papers is incomplete, thereby precluding the Court from considering it; (2) a court may not rely upon materials extraneous to the pleadings when deciding a motion to dismiss without giving notice of its intent to convert the motion into a motion for summary judgment (and no such notice was given here); (3) the acquittal of the President and First Lady on criminal charges does not foreclose a subsequent civil forfeiture action; and (4) Taiwanese prosecutors have appealed the district court's decision, "and thus, there has been no final determination that Taiwan's former first family did not commit bribery or money laundering offenses." (ECF No. 27 ("Gov't Mem.") at 14-17).

Turning to the Government's first contention, it is true that "[t]ranslations of foreign-language documents which are not certified as true and accurate translations and which do not even identify the translator . . . are not admissible as evidence." Ediciones Quiroga, S.L. v. Fall River Music, Inc., 93 Civ. 3914 (RPP), 1998 WL 851574,

at *2 n.3 (S.D.N.Y. Dec. 7, 1998). Nevertheless, a court is permitted to consider materials that would be inadmissible under the Federal Rules of Evidence when deciding a motion to dismiss. See Satyam Imports, Inc. v. Underwriters At Lloyd's Via Marsh, S.A., No. 03 Civ. 4387 (GEL), 2003 WL 22349668, at *2 (Oct. 14, 2003) (noting that on a motion to dismiss, "the question is not whether [an affidavit submitted by plaintiff's counsel] constitutes admissible evidence, but merely whether the plaintiff has alleged facts which, if proved, would defeat the [statute of] limitations defense"). Furthermore, Rule 44.1 of the Federal Rules of Civil Procedure provides that "[i]n determining foreign law, the court may consider any relevant material or source . . . whether or not . . . admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1.[5] Accordingly, the fact that the English translation of the summary of the Taipei District Court's decision is neither complete nor certified does not preclude the Court from considering it in determining whether the decision is entitled to preclusive effect as a matter of comity, or whether, in the Court's own view, Yuanta's payments amounted to bribery under Taiwanese law.

[5] Although Rule 44.1 of the Federal Rules is part of a set of rules pertaining to trials, courts in this District have relied on the Rule at the motion to dismiss stage. See AIM Int'l Trading, L.L.C. v. Valcucine S.P.A., No. 02 Civ. 1363 (PKL), 2003 WL 21203503, at *5 (S.D.N.Y. May 22, 2003) ("Under Rule 44.1, determinations of foreign law are questions of law to be decided by the Court. In a typical litigation involving foreign law, a motion to dismiss may be an appropriate time to decide the substance of another country's law that bears on the case at hand.") (internal citation omitted); Haywin Textile Prods. v. Int'l Fin. Inv. & Commerce Bank, Ltd., 152 F. Supp. 2d 409, 411 (S.D.N.Y. 2001).

The applicability of Rule 44.1 at the motion to dismiss stage likewise disposes of the Government's contention regarding the need to convert Avallo's motion to dismiss into a motion for summary judgment if the Taiwan Decision is to be considered. The Rule authorizes the Court to consider "any relevant material or source" in determining foreign law, Fed. R. Civ. P. 44.1, a description which obviously includes documents extraneous to the pleadings. See Haywin, 152 F. Supp. 2d at 411-12 (relying on expert affidavits concerning Bangladeshi law in deciding motion to dismiss). Moreover, as Avallo correctly observes, by attaching a summary of the Taipei District Court's decision to its moving papers, Avallo has not injected any additional facts into this case which would necessitate the taking of further discovery by the Government; rather, Avallo "requests only that the Court consider the prevailing legal interpretation by the courts of [Taiwan] of the facts alleged in the government's complaint." (ECF No. 30 at 2) (emphasis added). In other words, it is the Taipei District Court's application of Taiwanese law to the undisputed facts of the case that is relevant. In these circumstances, there is no need to convert Avallo's motion into a motion for summary judgment before considering the summary of the Taipei District Court's decision.

With respect to the Government's third contention, it is correct that "[n]either conviction nor even the commencement of criminal proceedings is a necessary precondition to an in rem forfeiture." von Hofe v. United States, 492 F.3d 175, 185 (2d Cir. 2007). The two principal rationales for this rule are that: (1) civil forfeiture proceedings are actions against the property itself, rather than the property owner, thereby

rendering the property owner's culpability irrelevant, see id., and (2) a higher standard of proof applies in criminal cases than in civil cases. See One Lot Emerald Cut Stones & One Ring v. United States, 409 U.S. 232, 235 (1972). Neither rationale, however, supports the Government's argument that the Taipei District Court's decision "is not dispositive in any United States civil forfeiture action." (Gov't Mem. at 16). First, while the criminal culpability of the property owner is irrelevant in determining whether the property is subject to forfeiture in an in rem action, the Government nevertheless must show, even at this preliminary stage of the case, that it is reasonable to believe that it will be able to prove at trial that "the property was involved in a violation to which forfeiture attaches." See United States v. Cherry, 330 F.3d 658, 669 n.16 (4th Cir. 2003). As noted previously, to establish the forfeitability of the Apartment, the Government must demonstrate a connection between the Apartment and the "bribery of a public official" in Taiwan. Accordingly, if no bribery has occurred, the Government will be unable to satisfy its burden.

With respect to the effect of the differing standards of proof in criminal and civil cases, Judge Moon persuasively observed in Ferndown that

> the Taipei court's decision did not turn on factual determinations that might be resolved differently under the preponderance of the evidence standard required under 18 U.S.C. § 983(c). Rather, the court determined that the alleged cash payment to [the First Lady] was not a bribe under Taiwanese law, since "handling the merger of financial institutions" was not among the president's official duties.

2011 WL 2441254, at *3 n.6 (internal citations omitted). Because the Taipei District Court held that the prosecution's version of the events, upon which the present action is based, was insufficient to establish bribery as a matter of Taiwanese law, it makes no difference in this case that "a fact that is not established beyond a reasonable doubt may well be established by a preponderance of the evidence." Id.

Finally, the Government contends that the Taipei District Court's decision should not be accorded preclusive effect because the "decision is currently on appeal to the [Taiwanese] High Court," and, therefore, is not a "final judgment." (Gov't Mem. at 14). As a preliminary matter, the Government has failed to cite any authority to support its assertion that the Taipei District Court's decision does not represent a final judgment under Taiwanese law. It seems odd that the Government would presume that the decision is not a final judgment since, under United States law, an acquittal by the trier of fact certainly represents a final judgment. See Smith v. Massachusetts, 543 U.S. 462, 467 (2005) (Double Jeopardy prohibits the prosecution from appealing such an acquittal). Moreover, "the pendency of an appeal from a conviction [generally] does not deprive a judgment of its preclusive effect." United States v. All Right, Title & Interest in Real Prop. etc., 901 F.2d 288, 292 (2d Cir. 1990) (emphasis added).

In any event, although a final judgment is an essential element of the doctrines of res judicata and collateral estoppel, see Ali v. Mukasey, 529 F.3d 478, 489 (2008) (collateral estoppel) and EDP Medical Computer Systems, Inc. v. United States, 480 F.3d 621, 624 (2d Cir. 2007) (res judicata), more than one court has concluded that

foreign "judicial acts need not always be final judgments to be granted comity." Remington Rand Corp. v. Bus. Sys., Inc., 830 F.2d 1260, 1266 (3d Cir. 1987) (citing In re Colorado Corp., 531 F.2d 463, 469 (10th Cir. 1976)).[6]

Even if the Court were to assume that the Taipei District Court's decision is not a final judgment and that only the final judgment of a foreign court is entitled to preclusive effect as a matter of comity, the Court still may consider the decision in the course of reaching its own independent determination as to whether the Government has adduced sufficient facts to support a "reasonable belief" that it will be able to prove at trial that Yuanta's payments to the First Lady constitute "bribery of a public official" under Taiwanese law. See Fed. R. Civ. P. 44.1 ("In determining foreign law, the court may consider any relevant material or source."). As shown in the next section of this Report and Recommendation, the Government cannot make such a showing. There consequently is no need resolve whether the decision constitutes a final judgment under Taiwanese law, or whether a court may grant preclusive effect to a non-final foreign judgment.

---

[6] In Ferndown, Judge Moon declined to dismiss the Government's case in its entirety on the basis of the Taiwanese court's decision, stating that, "[a]lthough principles of comity ordinarily suggest deference to foreign decisions, the Supreme Court has described comity as the practice 'among most civilized states, by which the final judgments of foreign courts of competent jurisdiction are reciprocally carried into execution.'" 2011 WL 2441254, at *3 (quoting Hilton, 158 U.S. at 166) (emphasis in Ferndown). Like the Government, Judge Moon assumed that the "Taiwanese courts have not yet issued a final judgment as to the alleged bribery." Id.

C. Bribery of a Public Official under Taiwanese Law

Taiwan's Anti-Corruption Statute applies only to "'public officials' who receive their official status in accordance with the law," "persons who are commissioned by government agencies to undertake specific public affairs duties," and "any person acting as an accomplice in collusion with any person subject to this statute." Anti-Corruption Statute, Articles 2 and 3, http://db.lawbank.com.tw/Eng/FLAW/FLAWDAT0202.asp (last visited August 26, 2011). As the Taipei District Court concluded, the First Lady "did not hold any public office. She merely had the status of the spouse of [the President] . . . . She [therefore] could never be prosecuted as a principal offender." (Taiwan Decision at 1). It follows that the Government cannot prove that "bribery of a public official" occurred unless it can demonstrate either that the First Lady acted "as an accomplice in collusion" with the President, who unquestionably is a "public official," or that the President played a more direct role in the alleged bribery.

Significantly, the Complaint in this action is devoid of any allegation that the President was aware that Yuanta had delivered NTD 200 million to the First Lady, let alone that he had any direct involvement in the bribery scheme. In the absence of such allegations, the mere fact that Yuanta delivered the cash to the First Lady in an effort "to avoid the interference of the Taiwan[ese] government, which was run by" the President, is insufficient to demonstrate that the First Lady acted "as an accomplice in collusion with" her husband.

In sum, regardless of the preclusive effect of the Taipei District Court's decision, the Government has failed to "state sufficiently detailed facts to support a reasonable belief that [it] will be able to meet its burden of pro[ving] at trial" that the payments made to the First Lady by Yuanta amounted to "bribery of a public official" under Taiwanese law.

## IV. Conclusion

For the foregoing reasons, Avallo's motion to dismiss, (ECF No. 22), should be granted without prejudice with respect to Claims One through Five and with prejudice with respect to Claim Six of the Complaint.[7] If the Taipei District Court's decision is reversed on appeal, the Government should be permitted to reinstate its first five claims.

## V. Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels and to my chambers at the United

---

[7] As noted earlier, the Government alleged in its sixth claim for relief that the Apartment was subject to forfeiture under Section 981(a)(1)(C) "because it constitutes or is derived from the proceeds of a conspiracy to commit" money laundering. (Compl. ¶ 45). Because the outcome of the appeal in Taiwan will not change the fact that money laundering is not included in the definition of "specified unlawful activity" set forth in Section 1956(c)(7), this claim should be dismissed with prejudice.

States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Daniels. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992).

Dated: New York, New York
August 26, 2011

FRANK MAAS
United States Magistrate Judge

Copies to:

Sharon Cohen Levin
Anna E. Arreola
Assistant United States Attorneys
United States Attorney's Office for the Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Jennifer Shasky Calvery
Linda M. Samuel
United States Department of Justice
1400 New York Avenue, N.W.
10th Floor
Washington, DC 20530

Paul Colinet, Esq.
Harris, Cutler, Cash & Houghteling LLP
111 Broadway, Suite 1401
New York, New York 10006

David B. Deitch, Esq.
Law Offices of David B. Deitch PLLC
1455 Pennsylvania Avenue N.W., Suite 400
Washington, DC 20004